## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **HEALTH CARE FOR ALL, INC., et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action** |
| ) | **No. 00-CV-10833-RWZ** |
| **MITT ROMNEY, Governor, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

### DEFENDANT STATE OFFICIALS' PROPOSED FINDINGS OF FACT
### AND CONCLUSIONS OF LAW PURSUANT TO FED. R. CIV. P. 52(a)

Pursuant to Fed. R. Civ. P. 52(a), the defendant State Officials hereby propose the following findings of fact and conclusions of law, and renew their motion for judgment on partial findings filed at the close of plaintiffs' case.[1]  As detailed below, plaintiffs have failed to sustain their burden of proving by a preponderance of the evidence that the State Officials, in their administration of the MassHealth dental program, have failed to comply substantially with the subject provisions of the Medicaid Act.

### I.   PROPOSED FINDINGS OF FACT

#### A.   Overview Of The Medicaid Act

1.   Title XIX of the Social Security Act, codified at 42 U.S.C. §§ 1396-1396v and commonly known as the Medicaid Act, is a joint federal-state program providing "federal

---

[1]The State Officials also renew and incorporate herein the arguments raised in their motion for summary judgment, opposition to plaintiffs' motion to amend, and motions *in limine*. As detailed in these previous filings, there is no private right of action under the subject provisions of the Medicaid Act and, assuming that such a right exists, it does not extend to the broad-based, systemic claims asserted here.  These arguments, however, will not be repeated here, but will, if necessary, be pursued on appeal.

financial assistance to States that chose to reimburse certain costs of medical treatment for needy persons." Pharmaceutical Research & Mfrs. of Am. v. Walsh, 538 U.S. 644, 650 (2003).

2.      States are not required to participate in the Medicaid program, but states that do accept federal funding must comply with the Act and with regulations promulgated by the Secretary of the Department of Health and Human Services.  See id.

3.      Most fundamentally, each participating state must devise and implement a plan for medical assistance that is approved by the Secretary.  42 U.S.C. § 1396; 42 C.F.R. § 430.10.

4.      A state plan must define categories of persons eligible to receive assistance and the specific types of care and services covered by the plan.  42 U.S.C. § 1396a(a)(10), (17).

5.      Broadly speaking, a state plan must provide coverage for all persons who are "categorically needy" and, at the state's option, also may provide coverage for persons who are "medically needy."  42 U.S.C. § 1396a(a)(10).  The "categorically needy" group includes those persons who lack sufficient income to meet their basis needs.  See Walsh, 538 U.S. at 651, n. 4 (citing 42 U.S.C.§1396a(a)(10)(A)(i)).  The "medically needy" group includes those persons who have resources to meet most of their basic needs, but not their medical needs.  Id. at n.5 (citing 42 U.S.C. § 13986a(10)(C)).

6.      In addition, a state plan must provide "medical assistance" for seven mandatory types of care and services.  42 U.S.C. § 1396a(a)(10)(A), § 1396d(a)(1-5), (17) and (21).  At the state's option, a state plan also may provide "medical assistance" for twenty additional types of care and services.  See id.

7.      The Act defines the term "medial assistance" as the "payment of part or all of the cost of [certain enumerated] care and services. . . ."  42 U.S.C. § 1396d(a).

8.     As relevant here, medical assistance for dental care and services is mandatory for eligible individuals under the age of 21, but optional for individuals age 21 and over.  42 U.S.C. § 1396a(a)(10(A), § 1396d(a)(4)(B), § 1396d(r)(3).

9.     Massachusetts participates in the Medicaid program and, consistent with the Act, its state plan, which is known as MassHealth, provides medical assistance or coverage for dental care and services to all eligible individuals under age 21.  (3rd Am. Compl. at ¶21; 130 C.M.R. § 420.400 et seq.; Tr. 4:71, 82).

10.    Prior to March 2002, MassHealth also provided optional coverage for a broad range of adult dental services.  (Tr. 4:76-78, 111; Ex. 30).  As a result of fiscal constraints, however, MassHealth has reduced the scope of its optional coverage for adult dental services. See id.  At the time of trial, only those adults who meet the criteria for "special circumstances" continue to be eligible for a broader range of optional dental coverage.  (Tr. 4:76-78, 111).

11.    "Special circumstances" exist where an individual has a "severe, chronic disability" that is likely to continue indefinitely and result in the individual being unable to maintain oral hygiene, or a "clinical condition (such as human immunodeficiency virus or cancer) that has advanced to a stage where an infection resulting from oral disease would likely be life-threatening."  (130 C.M.R. § 420.410(D); Tr 4:77).

12.    In addition, MassHealth continues to provide coverage for emergency dental services (i.e., services necessary to relieve pain) to eligible adults.  (Tr. 4:77).

**B.     At The Time Of Trial, All Of The Eligible Plaintiffs
         Had Access To Dental Services Covered By MassHealth**

13.    Four plaintiffs testified at trial.  Charlene Campbell and Elizabeth Curtis testified on behalf of their eligible children, and Sharon and William F. Liberty, Jr. testified on behalf of

themselves.  (Tr. 1:24, 76, 111, 123).  Based on the testimony of these witnesses, I find that, at the time of trial, all eligible plaintiffs had access to MassHealth covered dental services and care.

### The Campbell Children

14.     Ms. Campbell, for instance, testified that she resides in Kingston with her three children, Samantha, Scott and Jamey.  (1:76-77).  The Campbell children have been eligible for MassHealth dental coverage since approximately 1989 and remained eligible at the time of trial. (Tr. 1:78).

15.     As a result of the reduction in coverage for most adult dental services, Ms. Campbell has not been eligible for MassHealth dental coverage since 2002, and she was not eligible at the time of trial.  (Tr. 1:78, 93).

16.     Since at least September 2003 and continuing to the time of trial, the Campbell children have been receiving dental care from Unident, a MassHealth dental provider located in the Hanover Mall.  (Tr. 1:93-95, 87).

17.     Although Unident was not on the list of MassHealth providers that Ms. Campbell requested from MassHealth in or about 1991, (Tr. 1:93-95), it is listed on the most recent list of participating providers supplied by MassHealth.  (Ex. 124).

18.     Furthermore, regardless of how she came to be there, Ms. Campbell testified that she is satisfied with the care being provided by Unident to her children.  (Tr. 1:93-95).

### The Curtis Children

19.     Mrs. Curtis currently lives in Bourne, Massachusetts with her husband and six children.  (Tr. 1:24-25).  At the time of trial, three of the Curtis children, Ethan, Max and Cyrus (referred to herein as, "the Curtis children"), were eligible for MassHealth.  (Tr. 1:25).\

20.     Since the Curtis children became eligible for MassHealth in or about January 1999, they have received dental care and services from a number of different MassHealth providers.  For a sixteen month period (from approximately April 1999 to the summer of 2000), the Curtis children received dental care and services from Centerville Dental, which was located approximately 40 minutes away from the Curtis's home, depending on traffic.  (Tr. 1:33, 69).  It took Mrs. Curtis approximately 3 months to locate and obtain her first appointment with Centerville Dental; none of the Curtis children had been to the clinic before.  (Tr. 1:33, 68).

21.     Mrs. Curtis considered the care provided by Centerville Dental to be "excellent," (Tr. 1:33, 69), and acknowledged that MassHealth paid for all of the services provided by Centerville Dental.  (Tr. 1:69).

22.     Eventually, Mrs. Curtis decided to transfer her children's dental care to the Tatnket Clinic in Falmouth because, among other things, it took only about 10 minutes to drive there from her home.  (Tr. 1:36, 36).  It took Mrs. Curtis approximately one month to obtain her children's first appointment with Tatnket, which also accepted MassHealth coverage.  (Tr. 1:37-38).

23.     The Curtis children continued to receive dental care from Tatnket Clinic throughout 2001.  (Tr. 1:46-47,72).  Mrs. Curtis testified, however, that she was not happy with the layout and quality of care provided by the clinic.  Based on her observations, the examination rooms were "very small" and "dimly lit," and the dentist spent "less than 15 minutes" examining and cleaning her children's teeth.  (Tr. 1:40, 42).

24.     Because she was dissatisfied with the care provided by Tatnket Clinic, Mrs. Curtis attempted, in or about August 2000, to return to Centerville Dental for her children's dental care.  (Tr. 1:45-46).  She learned, however, that, because she had left the practice, she

would have to add her name to a waiting list that Centerville Dental had established for new appointments. (Tr. 1:46). There was an approximately six month wait for new appointments. (Tr. 1:46). Mrs. Curtis elected not to add her name to the list, and her children continued to receive dental care at the Tatnket Clinic. (Tr. 1:46, 47).

25.     In December 2001, the Tatnket Clinic closed for 18 months due to a fire. (1:47,72).

26.     For a brief period of time, beginning in December 2002, the Curtis children received basic dental care from a Dr. Truscott, who did not participate in MassHealth. (Tr. 1:48). The Curtis family paid out-of-pocket for Dr. Truscott's services. (Tr. 1:48).

27.     Prior to the children's next scheduled six-month appointment with Dr. Truscott, the Tatnket Clinic reopened and the Curtis children returned there for dental care. (Tr. 1:51-52, 74).

28.     Mrs. Curtis continued to be dissatisfied with the care her children received at the Tatnket Clinic. (Tr. 1:51-52, 74). The dentist, for instance, did not want Mrs. Curtis to remain in the room while the children were being examined, but she did so anyway. (Tr. 1:51). In addition, Max experienced pain when he received filings for several cavities, and Cyrus's fillings allegedly fell out about a month after they were put in. (Tr. 1:52-53).

29.     Cyrus eventually required specialty dental care from an orthodontist. (Tr. 1:53). Mrs. Curtis arranged for Cyrus to see Dr. William Falla, an orthodontist with two offices on Cape Cod (Falmouth and Hyannis) who participates in MassHealth. (Tr. 1:53-54, 72-73). Dr. Falla supplied Cyrus, and later Max, with braces. (Tr. 1:54).

30.     Mrs. Curtis testified that she was "very satisfied" with the treatment provided by Dr. Falla and that his Hyannis office was located a "manageable" distance from her home. (Tr. 1:53-54, 73). MassHealth paid for the services provided by Dr. Falla. (Tr. 1:73).

- 6 -

31.     After Cyrus's wisdom teeth started to come in, Dr. Falla referred Cyrus to Dr.

Pozatek, an oral surgeon practicing in Scituate.  (Tr. 1:54-55).  It took approximately three

months for Mrs. Curtis to obtain an appointment for Cyrus at Dr. Pozatek's office, which was

approximately an hour's drive from the Curtis's home.  (Tr. 1:55, 73).  Cyrus had not been a

patient of Dr. Pozatek prior to this time.  (Tr. 1:73).

32.     In or about October 2003, Mrs. Curtis attempted to return to Centerville Dental

for her children's dental care, but learned that Centerville Dental was no longer accepting

MassHealth.  (Tr. 1:56).

33.     Shortly thereafter, in or about November 2003, Mrs. Curtis called MassHealth's

customer service line and requested an updated provider list.  (Tr. 1:56, 58, 74; Pl.'s Ex. 3).

34.     Mrs. Curtis proceeded to highlight and call only the participating MassHealth

dentists located on Cape Cod.  (Tr. 1:58, 60, 62, 75; Pl.'s Ex. 3, pp. 12-13).

35.     Based on her phone calls to participating providers on Cape Cod, Mrs. Curtis

learned that some of the dentists on the list were no longer participating in MassHealth and some

had waiting lists for new appointments.  (Tr. 1:61-62).

36.     Mrs. Curtis admitted that she did not call or attempt to schedule an appointment

with any dentists on the MassHealth provider list with an office located off Cape Cod, but

nevertheless in the southeastern region of the state.  (Tr. 1:75).

37.     The list included, for instance, several MassHealth participating dentists with

offices in New Bedford, which is about an hour's drive from the Curtis's home on Cape Cod.

(Tr. 1:75; Pl's. Ex. 3, p. 12).  Mrs. Curtis believed, however, that New Bedford was too far to

drive to obtain dental care, even though she commutes for work on a regular basis to the State of

New York.  (Tr. 1:26, 75).  I do not credit Mrs. Curtis's testimony that these alternative

MassHealth providers were not available to provide dental care and services to her three eligible children simply because they were not located on Cape Cod.

38.      In this regard, I find it significant that Mrs. Curtis did not request transportation services from MassHealth, which pays for transportation for eligible members to and from dental appointments, and that she herself travels great distances for work.  (Tr. 1:26, 65; 130 C.M.R. § 407.400 et seq.).

39.      In addition to the availability of MassHealth dental providers in their general geographic area (albeit not necessarily on Cape Cod), I find that the Curtis children could, if Mrs. Curtis so chose, continue to receive dental services from the Tatnket Clinic, which continued to participate in MassHealth up until the time of trial.  (Tr. 1:64).  Merely that Mrs. Curtis has declined for her own personal reasons not to seek additional services from the Tatnket Clinic, Tr. 1:64, does not render this MassHealth provider unavailable to provide dental care and services to the three eligible Curtis children.

40.      Furthermore, plaintiffs fail to explain why the three eligible Curtis children cannot access dental care and services from Dr. Falla, who operates two offices on Cape Cod and previously provided the Curtis children with highly satisfactory dental care.  (Tr. 1:53-54, 72). At the time of trial, Dr. Falla continued to participate in MassHealth and, thus, I find he continued to be available to provide at least orthodontal dental care and services to the Curtis children who remained eligible for MassHealth.  (Tr. 1:62; Ex. 124, p. 12; Pls.' Ex. 3, p. 12).

Sharon and William Liberty

41.      Sharon Liberty lives in Dudley, Massachusetts with her husband William.  (Tr. 1:111, 123; Plfs.' Ex. 5, ¶2; Plfs.' Ex. 6, ¶2).  Mr. and Mrs. Liberty are both disabled and wheelchair bound.  (Tr. 1:112, 125; Plfs.' Ex. 5, ¶2, Plfs.' Ex. 6, ¶2).

42.     Mrs. Liberty has cerebral palsy and scoliosis.  (Tr. 1:113).  Mr. Liberty has cerebral palsy also and suffers from grand mal seizures.  (Tr. 1:125).  Mr. Liberty has full use of his left hand, but limited use of his right hand.  (Tr. 1:125-26).  He is able to brush his own teeth with an electric toothbrush and has a personal care attendant, who is with him every day, to assist him with flossing.  (Tr. 1:127).

43.     Mr. and Mrs. Liberty both require specialized dental care, and both are currently eligible for MassHealth dental benefits under the "special circumstances" exception for adult dental coverage.  (Tr. 1:112, 121, 126-27; see 130 C.M.R. § 420.410(D)).

44.     Starting in 2001 and continuing up to the time of trial, Mrs. Liberty has been receiving dental care at the Tufts Dental Facility for the Handicapped, which is located in Waltham.  (Tr. 1:115-16, 120).

45.     Tufts participates in MassHealth, and MassHealth pays for all of the dental services provided to Mrs. Liberty, which, to date, have included cleanings, examinations, x-rays, scalings, and fillings.  (Tr. 1:116, 120-21).

46.     Mrs. Liberty goes to the Tufts clinic for dental services about every three months, and MassHealth pays for Mrs. Liberty's transportation to and from her appointments.  (Tr. 1:120, 122).

47.     Because Mrs. Liberty had a spinal fusion, she needs to be treated while sitting in an upright position.  (Tr. 1:114, 119, 121; Plfs.' Ex. 5, ¶5).  Not all dentists have been willing to treat Mrs. Liberty while sitting in an upright position.  (Tr. 1:121).  The clinicians at Tufts, however, have been willing to treat Mrs. Liberty in an upright manner, although they have declined to transfer Mrs. Liberty from her wheelchair to a dental chair.  (Tr. 1:121-22; Plfs.' Ex. 5, ¶6).

48.    From approximately 1996 to 2000, Mr. Liberty received dental care at the Harvard Dental School Faculty Practice.  (Tr. 1:130; Defs.' Ex. 3).  MassHealth paid for those services and Mr. Liberty was satisfied with the care that Harvard provided.  (Tr. 1:130; Defs.' Ex. 3).

49.    In approximately September 2000, Harvard stopped participating in MassHealth. (Tr. 1:130; Defs.' Ex. 3, pp. 3-4).  Mr. Liberty had difficulty finding a new MassHealth provider who was able to treat a person with his condition (seizures) and whose office was handicapped accessible.  (Tr. 1:131-32; Defs.' Ex. 3, p. 3).

50.    MassHealth referred Mr. Liberty to the Tufts Dental Clinic at the Fernald School, which was able to treat Mr. Liberty and was handicapped accessible.  (Tr.  1:135; Defs.' Ex. 3, pp. 3-4).  MassHealth also arranged and paid for Mr. Liberty's transportation to and from the clinic.  (Tr. 1:132).

51.    Mr. Liberty went to Tufts for one dental appointment.  (Tr. 1:128, 135). During that appointment, Mr. Liberty asked to be physically transferred from his wheelchair to the examination chair, but the clinician did not respond and continued to treat him while he remained seated in his wheelchair.  (Tr. 1:128-29, 136).  When Mr. Liberty was receiving dental care at Harvard, in contrast, the clinicians there were willing to move him from his wheelchair to the examination chair.  (Tr. 1:131).

52.    Although Mr. Liberty never complained to MassHealth about the care he received during his first visit at Tufts, he has declined to return to the clinic for further treatment.  (Tr. 1:128-29, 136; Defs.' Ex. 3, p.4).

53.    The evidence establishes however, and I so find, that the Tufts clinic continues to be available to provide dental care MassHealth recipients with disabilities, like Mr. and Mrs. Liberty.  (Tr. 1:116, 120-21, 136).

**C.    Participating MassHealth Safety Net Providers Provide Eligible Recipients With Additional Means Of Access To Dental Care And Services**

54.    In addition to presenting testimony from individual named plaintiffs, plaintiffs presented testimony from several "safety net providers," who participate in the MassHealth dental program, including representatives of Children's Hospital, Dorchester House, Great Brook Valley Community Health Center, and Mid-Upper Cape Community Health Center.  (Tr. 2:5, 132, 148; Tr. 3:4; Tr. 4:14, 52).  The parties stipulated that the conditions and circumstances existing at these safety net providers were representative of conditions and circumstances existing statewide.  (Tr. 4:66).

55.    The term "safety net providers" refers to those providers of dental services who provide dental care and treatment to predominately low-income residents of the Commonwealth, including persons eligible for MassHealth, persons eligible for free care, and persons without dental insurance or the resources to pay for private dental care.  (Tr. 2:74).  Safety net providers operate as community health centers, hospital licensed health centers or hospitals.  See Tr. 4:93.

56.    Since 2000, the Commonwealth, through infrastructure grants, has doubled the number of safety net providers from 22 to 44 at the time of trial.  (Tr. 2:74, 117, 141-42, 147; Tr. 4:130; Compare Ex. 1 at 78 with Ex. 140).  These safety net providers, which typically provide a broad range of dental services, are geographically dispersed throughout all parts of the state.  (Tr. 2:118, 143, 146-47, 152; Ex. 140).

57.    Generally speaking, the mission of safety net providers is to see as many patients as possible, regardless of the patient's ability to pay, and to accept as many different insurance plans as possible.  (Tr. 2:7, 11, 150).

58.     The typical patient mix at safety net providers includes a heavy percentage of MassHealth-eligible recipients and uninsured individuals.[2]  (Tr. 2:22, 162).  Consistent with their mission to provide health care to low-income individuals, safety net providers continue to provide a substantial volume of services to adult patients, even though those patients are no longer eligible for reimbursement under MassHealth.  (Tr. 4:21, 38-40).

59.     Dr. Mark Doherty, the Dental Director of Dorchester House, for instance, testified that approximately 42% of the patients treated by Dorchester House are children and most of them (i.e., 95%) are eligible for MassHealth.  Of the remaining 58% of patients (i.e., adults) treated by Dorchester House, approximately 90% are uninsured and some of them qualify for uncompensated or free care.  (Tr. 2:153).

60.     Similarly, Dr. Stephen Shusterman, Chief Emeritus Dentist at Children's Hospital testified that last year Children's treated a total of approximately 6,000 dental patients.  (Tr. 2:22-23).  Virtually all of the patients seen by Children's Hospital are children since the hospital does not really have the expertise to treat adults.  (Tr. 2:22-23).  Approximately 65 to 70 percent of the total patients seen by Children's last year were eligible for MassHealth.  (Tr. 2:22).  The remaining 35 to 30 percent of patients were not MassHealth eligible.  See id.

61.     Zoila Feldman, the president and CEO of Great Brook Valley Health Center in Worcester, likewise testified that 59% of Great Brook's patients are uninsured, 31% are MassHealth eligible, and 10% are privately insured.  (Tr. 4:14, 20).  During the past fiscal year,

---

[2]In Massachusetts, approximately 62% of the population has private dental insurance, 35% has no dental insurance and only a "very small percentage" (i.e., approximately 3%) are MassHealth-eligible.  (Tr. 5:17-18).

Great Brook Valley's three dental clinics[3] had a total of 26,000 dental patient visits, of which approximately 6,000 visits (or roughly 23%) were made by MassHealth patients.  (Tr. 4:21). The remaining 20,000 visits (or 77%) were made by patients not eligible for MassHealth.  See id.

62.     MassHealth provides incentives to safety net providers to increase access to dental care for eligible recipients.  (Tr. 4:93-95).  Through the Dental Partnering Project, for instance, MassHealth pays qualified dental providers an enhanced fee of $15.00 per patient per visit.  (Tr. 3:13-15, 34-35; Tr. 4:47, 93-94).

63.     To qualify for the enhanced fee, the provider must submit a plan to increase access to dental care by expanding hours of operation, building new dental facilities, increasing staff, adding new specialty services, partnering with private dentists in their area, or adopting any other program likely to increase access to dental services.  (Tr. 3:13-15, 34-35; Tr. 4:94).

64.     In addition, MassHealth and other agencies of the Commonwealth provide grants to assist safety net providers in expanding access to dental services.  (Tr. 2:106-13, 116-17; Tr. 4:16-18, 96-99).  The grants are used, among other things, to add new dental treatment facilities, to recruit new dental providers, and to implement school-based treatment programs.  (Tr. 2:106-13, 116-17).

65.     As a result of these and other programs aimed at increasing the infrastructure for dental services in Massachusetts, utilization data for MassHealth dental services establishes that between FY 2001 and FY 2004 there was a net increase of 19,632 in the number of

---

[3]On August 31, 2004, Great Brook Valley closed one of its dental clinics because the clinic's partner, Quinsigamond Community College, decided that it no longer wanted to participate in the program.  (Tr. 4:16-18).  Until its closing, the Quinsigamond clinic operated through a grant provided by the Commonwealth.  (Tr. 4:17).

"unduplicated" members (i.e., members who received services are counted only once) under the age of 21 who received dental services.  (Tr. 4:99-101, 136, 139; Ex. 49 (FY 2001-2003); Ex. 114 (FY 2004)).[4]

66.     This represents over a 12% increase in the number of MassHealth eligible children who received dental services from fiscal year 2001 to 2004.[5]  (Tr. 4:101).

67.     Throughout the trial of this action, plaintiffs criticized the State Officials' reliance on safety net providers as a means of increasing access to dental care and treatment among eligible MassHealth members and argued that greater efforts should be made to expand the network of private dental providers in the MassHealth system.

68.     Through the testimony of their expert, Dr. Robert Compton, the Chief Dental Officer of Delta Dental of Massachusetts,[6] plaintiffs suggested that if MassHealth increased its reimbursement rates and emulated more of the marketing strategies of private insurance

---

[4]The 19,632 figure is reached in the following manner.  The FY 2001 utilization report establishes that a total of 158,759 children received dental services that year.  (Ex. 49 at p.7).  The FY 2004 utilization report establishes that a total of 178,391 children received dental services that year.  (Ex. 114 at p.7).  The difference between these figures (178,391 minus 158,759) establishes that there was a net increase of 19,632 in the number of eligible children who received dental services between FY 2001 and FY 2004.  (Tr. 4:103, 136)

[5]The percentage increase is calculated by dividing net increase in the number of eligible children who received dental services in FY 2004 (19,632) by the number of eligible children who received dental services in FY 2001 (158,759).  See Tr. 4:103.

[6]Delta Dental is by far the largest private insurer in Massachusetts, with gross revenues in excess of $600 million in Massachusetts alone and, nationally, in excess of $1½ billion.  (Tr. 3:45, 56-57).

companies, like Delta Dental, it might attract more private dental providers into its network.[7] (Tr. 5:62, 66-68).

69.     The Court's role in this litigation, however, is not to second guess the policy decisions of MassHealth program administrators as to where to best direct limited program resources and energies, but, instead, to determine (at least in the first instance) whether plaintiffs have sustained their burden of establishing that the State Officials, in their administration of the program, are depriving plaintiffs and similarly situated eligible persons of a cognizable right to federally-mandated Medicaid dental services.

70.     Unless plaintiffs establish such a violation of rights conferred by federal law, I need not address the question of what administrative or programmatic reforms might be necessary to remedy any such violation.  See Tr. 4:5-8.

**D.      The Time For Scheduling An Appointment With MassHealth Safety Net Providers Varies Depending On The Policies Of The Individual Provider**

71.     Plaintiffs contend that defendants are not in compliance with the Medicaid Act because patients, particularly new patients, seeking dental services at participating MassHealth safety net providers frequently experience delays in scheduling their appointments.

---

[7]Even Dr. Compton acknowledged, however, that current MassHealth reimbursement rates for children's services are not substantially lower (i.e., only about 10% lower) than the rates paid under the most comparable Delta Dental insurance plan. (Tr. 3:149; Tr. 5:65).  Moreover, other evidence establishes that the Commonwealth is currently undertaking a review of its dental reimbursement rates based, in large part, on pricing information supplied by Delta Dental. (Tr. 4:76, 109-10; Tr. 5:131-35, 143, 145).  In addition, MassHealth program administrators have implemented or are considering implementing a range of programmatic reforms intended to make the MassHealth program more attractive to private dental providers. (Tr. 4:83-98; Tr. 6:82-83).  Furthermore, the comparisons that plaintiffs seek to draw between the number of private dentists in the Delta Dental network and the MassHealth network are flawed because the evidence establishes that MassHealth counts participating dentists only by provider identification numbers, which may not reflect the actual number of dentists providing services to MassHealth-eligible patients. (Tr. 4:132; Ex. 117).  Safety net providers, for instance, have multiple dentists on staff, but nevertheless are counted as one provider on internal MassHealth reports. (Tr. 2:15-16, 151; Tr. 4:19, 132; Ex. 117).

72.     There are, however, no state-mandated waiting periods for dental services.  (Tr. 2:62).

73.     Instead, the evidence establishes, and I so find, that each safety net provider handles appointment scheduling differently.  Some providers give a preference to children.  Other providers give a preference to existing patients.  And yet other providers do not distinguish between existing and new patients, or between children and adults, but apply the same policy to all patients.

74.     Not surprisingly, therefore, the time for obtaining a routine dental appointment (i.e., not emergency or urgent care, which all providers schedule the same day) varies depending on the particular scheduling policies established by each individual provider.

75.     Moreover, the evidence establishes, and I so find, that any delays in scheduling experienced by patients of the various safety net providers are experienced by all patients, not just those patients who are eligible for reimbursement under MassHealth.

Children's Hospital

76.     Dr. Shusterman, for instance, testified that, because Children's Hospital prefers to see younger patients in the morning and there are fewer morning appointments available, there is a wait of approximately one month to five weeks for new patients under the age of 5 seeking an initial examination.  (Tr. 2:26-27).  New patients over the age of 5 have a shorter wait.  (Tr. 2:26-27).  They typically may obtain an initial examination appointment within in 2 to 3 weeks.  (Tr. 2:27).

77.     In addition, Dr. Shusterman testified that the wait tends to be shorter at the beginning of the year when the new residents come on board than later in the year when the residents are carrying a fuller patient load.  (Tr. 2:29).

78.     Once a new patient has been seen for an initial visit, which includes an overall dental examination, assessment and instruction in oral hygiene, x-rays, and (if the patient is cooperative) prophlaxis fluoride application, there is typically a three to six week period for providing any follow-up care that may be required.  (Tr. 2:27, 30-32).

79.     Patients with emergent needs, such as pain, swelling or some other acute complaint, are seen the same day.  (Tr. 2:26-27).  As Dr. Shusterman testified, "[t]here's no wait for emergency care, ever."  (Tr. 2:27).

80.     For non-emergency patients requiring operating room services, which typically is limited to patients who are extremely young, have overwhelming decay, or are physically or emotionally challenged, Dr. Shusterman testified that there is a waiting list of six to eight months depending on the time of year.  (Tr. 2:37).

81.     The longer wait for operating room services at Children's is a reflection, at least in part, of the fact that the hospital operating rooms are generally "pretty busy" and the Dental Department, which shares the operating rooms with other medical departments, has the equivalent of only two and a half days of operating time allocated to it per week.  (Tr. 2:39).

82.     On average, out of 21,000 patient visits per year, only 450 or approximately 2% of all patient visits require operating room services.  (Tr. 2:40).

83.     All of the waiting periods utilized by Children's Hospital apply to all patients, not just patients who are eligible for MassHealth.  (Tr. 2:41).

Dorchester House

84.     Dorchester House has a different scheduling system than that utilized by Children's Hospital.  Unlike Children's, Dorchester House does not distinguish between initial and follow-up appointments.

- 17 -

85.     Dr. Doherty testified that, at the time of trial, all dental appointments at Dorchester House, whether for an initial visit or for follow-up care, are booked 50 days in advance so there is roughly a two-month wait for an appointment.  (Tr. 2:155, 158).

86.     Children, however, are given a preference in scheduling over adults.  (Tr. 2:157).  Thus, the waiting period for children at Dorchester House may be less.  See id.

87.     The same scheduling applies to the dental clinic that Dorchester House operates out of Taunton High School.  (Tr. 2:160-62; Tr. 3:7-8, 10-11).

88.     Like Children's Hospital, however, Dr. Doherty testified that patients at Dorchester House who are in need of emergency dental care for swelling or pain are "guarantee[d]" to be seen the same day, although they may have to wait until a clinician becomes available.  (Tr. 2:157-58).

                    Mid-Upper Cape Clinic/Ellen Jones Clinic

89.     Testimony from other community health centers establishes that other participating MassHealth safety net providers sometimes distinguish between existing patients and new patients in scheduling dental appointments.

90.     For instance, Dr. Timothy Martinez, the interim Dental Director at the Mid-Upper Cape Clinic and the former Dental Director at the Ellen Jones Clinic, both of which are located on Cape Cod, testified that there is no wait for existing patients at either the Mid-Upper Cape Clinic or the Ellen Jones Clinic.  (Tr. 4:54, 58-60).  Existing patients at both clinics are ordinarily seen within 2 to 4 weeks.  (Tr. 4:58, 60).

91.     Patients who have not been to the clinics previously, however, may have to wait from six months to a year to obtain an appointment at the clinics.  (Tr. 4:58, 60).

92.     Dr. Martinez's testimony is consistent with testimony of Mrs. Curtis, who testified that when she called the Ellen Jones Clinic in or about November 2003 seeking an appointment for her children, who had not been to the clinic previously, she was told that "first appointment" she could have was "within a year."  (Tr. 1:35, 57, 61).  Mrs. Curtis decided not to place her name on the waiting list.  (Tr. 1:35, 61, 70).

Great Brook Valley

93.     Similarly, Ms. Feldman testified that, at the time of trial, there was no waiting list for established patients at either of Great Brook Valley's two dental clinics in the Worcester area. (Tr. 4:15, 17, 24-25).  Instead, established patients are already in the appointment system and their appointments are scheduled by clinical necessity.  (Tr. 4:24, 25).

94.     Great Brook Valley does, however, have two waiting lists for new dental patients. (Tr. 4:23).  The first list is for dental patients who have a preexisting relationship with the center (i.e., they receive primary care at the center).  (Tr. 4:24).  Ms. Feldman testified that there are currently about 200 names on this list and the average wait is approximately 3 months, unless the patient requires urgent care.  (Tr.  4:24).

95.     The second list is for new patients who have no prior relationship with the center. (Tr. 4:23-24).  There are approximately 800 names on the second list and the wait for an appointment may be as much as six months, but the center schedules appointments only three months out and calls people on the list to fill in missed or cancelled appointments.  (Tr. 4:25-27).

96.     In reality, therefore, Ms. Feldman testified that the average wait for a new patient seeking an appointment, even a new patient with no prior affiliation with the center, is less than six months, particularly if the patient is persistent in seeking an appointment.  (Tr. 4:27).

97.     As with the other providers, Ms. Feldman testified that the same scheduling delays apply to all clinic patients, regardless of whether they are MassHealth eligible.  (Tr. 4:45).

98.     In addition, like the other MassHealth providers, Great Brook Valley has no waiting period for patients in need of emergency care.  (Tr. 4:22-24).

### E.     Utilization Data Does Not Establish Unmet Demand For Dental Services

99.     To establish what they contend is unmet demand for dental services among eligible MassHealth members, plaintiffs point to what they regard as relatively low utilization of dental services by eligible members, particularly eligible children.

100.     Based on his review of utilization data produced by the defendants,[8] plaintiffs' expert, Dr. Compton, testified that, at the time of trial, approximately 33% to 34% of the total number of children eligible to receive dental services had a dental visit within the past fiscal year.  (Tr. 3:107).

101.     Dr. Compton readily admitted, however, that utilization of dental services reflects only the number of eligible children who received such services; it does not reflect the need for dental services among eligible members.  (Tr. 3:107, 112-13).

---

[8]There are two types of utilization reports generated by MassHealth.  The first is an internal utilization report broken down, among other things, by age group and individual procedure codes.  (Ex. 114).  The second is a report that state administrators are required to file each year with the federal government, the so-called "CMS-416 report," relating to the utilization of EPSDT services in the state.  (Exs. 72, 113).  With regard to eligible children, both reports establish that current utilization of dental services among eligible children are within the range of 33% to 34%.  (Tr. 3:107).  The most recent internal utilization report (State FY 2004), for instance, establishes that utilization of dental services among eligible children is currently 33.6%.  (Ex. 114).  The most recent CMS-416 report (Federal FY 2003) establishes that utilization of EPSDT dental services by eligible children is 33.3%.  (Ex. 113; Tr. 3:107).  These percentages are reached by dividing the total number of eligible children by the number of children who actually received dental services within the reporting period.

- 20 -

102.   Dr. Compton testified that the need for increased access to dental services among children eligible for MassHealth is established by the higher incidence of dental disease among the MassHealth-eligible population than the general population.  (Tr. 3:113-16).

103.   Since there is a clinical need for dental services among the eligible population, Dr. Compton simply assumed that there must be an unmet demand for such services among eligible MassHealth members and, so the reasoning goes, that the State Officials are not providing sufficient access to such services.  See Tr. 3:113-14, 138, 141.

The 2004 Oral Health Report

104.   In support of this theory, Dr. Compton relied primarily on data contained in *The Massachusetts Oral Health Report*, released in May 2004 (hereinafter, the "2004 Oral Health Report").[9]  See Tr. 3:111-15, 138, 141; Ex. 145.

105.   The 2004 Oral Health Report sets forth the results of a clinical health survey conducted over a six month period (during the summer 2003) by the state Department of Public Health ("DPH") in collaboration with other private and public entities.  (Tr. 2:83-84, 89; Ex. 145 at pp. 3, 8).

106.   A total of 3,439 third graders, geographically distributed throughout all parts of the state in a manner consistent with the state's population density, participated in the survey. (Tr. 2:89, 93; Ex. 145 at pp. 5, 9-10).

107.   Parents of the children were required to complete a consent form and a questionnaire that, among other things, asked them to identify what type of insurance, if any,

_____

[9]Dr. Compton also relied on records establishing that, in or about 1999 to 2001, the MassHealth member services hotline received approximately 4000 calls from members who were having difficulty locating a participating dental provider.  (Tr. 5:108, 112-13, 120; Ex. 23). Not only were these phone records several years old by the time of trial, but there is no evidence whatsoever to establish how the calls were resolved.  See id.

their family had and how long it had been since their child's last dental visit.  (Tr. 2:88, Ex. 145 at pp. 10-11).

108.    Over 73% of the third graders whose parents reported them as being MassHealth eligible responded that they had received a dental checkup within the past year.  (Tr. 2:99-100; Ex. 145 at p. 40).

109.    Over 71% of the third graders whose parents reported them as being MassHealth eligible listed a dentist. (Tr. 2:100; Ex. 145 at p. 40).

110.    Over 40% of the third graders whose parents reported them as being MassHealth eligible reported that they had received one or more dental sealants in the past year.  (Tr. 2:100; Ex. 145 at p. 40).

111.    Despite these encouraging statistics, the survey nevertheless revealed that MassHealth eligible third graders had fewer dental visits and poorer oral health than third graders with private dental insurance or no insurance.  (Ex. 145 at p. 4).

112.    The 2004 Oral Health Report does not offer any conclusions to explain the survey results; it merely compiles the data generated by the survey.  (Ex. 145).  The evidence establishes, however, and I so find, that the results reported in the 2004 Oral Health Report relating to the higher incidence of dental disease among Medicaid-eligible third graders are not in any way unique to Massachusetts.  (Tr. 2:95; Ex. 1 at p. 3).

Studies Demonstrate That The Medicaid-Eligible Population
Have A Higher Incidence Of Dental Disease

113.    Nationally, studies have shown that 80% of caries (the technical term for cavities) are concentrated in just 25% of children, disproportionately among low-income and minority children.  (Ex. 1 at p. 28; Tr. 3:130-31).  Even in communities with fluoridated water supplies, low-income and minority children have more tooth decay than their more affluent neighbors do.  (Ex. 1 at p. 29).

114.    Dr. Shusterman of Children's Hospital, confirmed that, based on his clinical observations, the prevalence of dental disease among "lower/middle socioeconomic levels tend to be higher" than the general population and that this is true regardless of whether or not the patient is eligible for MassHealth.  (Tr. 2:56).

115.    The reasons for the disproportionate burden of dental disease among low-income and minority children are "complex and not entirely understood."  (Ex. 1 at pp. 3, 29).

116.    Mary Foley, the Director of DPH's Office of Oral Health and one of the principal authors of the 2004 Oral Health Report, testified (as part of the plaintiffs' case-in-chief) that it is commonly understood that certain demographic factors affect the prevalence of dental disease among certain segments of the population.  (Tr. 2:97; Ex. 145 at p. 21).

117.    The very young and the very old, for instance, are at a greater risk of dental disease than the rest of the population.  (Tr. 2:97; Ex. 145 at p. 21).

118.    Similarly, persons with less than 12 years education or who earn less than $15,000 a year are at a higher risk of dental disease than those with more education and higher incomes.  (Tr. 2:98; Ex. 145 at p.21).

119.    Education is an important risk factor because people may lack adequate information to understand the importance of good oral health habits such as regular toothbrushing and avoiding excessive sugar consumption.  (Ex. 1 at p.29; Tr. 6:9).  In addition, studies show that persons with higher incomes tend to have more education than persons with lower incomes.  (Tr. 6:12-13).

120.    Race, ethnicity, and cultural and language barriers are other demographic factors known to influence the risk of dental disease.  (Tr. 2:97-98).

121.    The plaintiffs' expert, Dr. Compton, acknowledged that many of these risk factors are concentrated in the Medicaid eligible population.  (Tr. 3:130-31).

122.   Ms. Foley agreed that, since low income is a key factor in determining Medicaid eligibility, persons eligible for MassHealth are at a greater risk of dental disease than other population groups.  (Tr. 2:99; <u>see</u> <u>also</u> Tr. 4:117-18).

123.   Dr. David Noel, the Chief Dental Program Consultant for the State of California's Medicaid program, likewise offered his expert opinion that the very "things that ma[k]e folks eligible for Medicaid in the first place" (<u>i.e.</u>, income, education, and cultural background) set them apart from the non-Medicaid eligible population in terms of risk for dental disease.  (Tr. 6:8-9).  The privately insured and uninsured, for instance, tend to have higher incomes and more education than persons eligible for Medicaid and, therefore, studies have shown that they do not experience the same level of dental disease as the Medicaid-eligible population.  (Tr. 6:12-14).

124.   Given the concentration of oral health risk factors in the Medicaid-eligible population, it is not surprising that studies, including the 2004 Oral Health Report, find a higher incidence of dental disease in this segment of the population than the non-Medicaid eligible population.  <u>See</u> Tr. 3:131.  Therefore, I do not credit Dr. Compton's assumption that the higher incidence of oral health disease among Medicaid-eligible children is attributable to the State Officials' alleged failure to properly administer the MassHealth dental program in compliance with federal law.

125.   Indeed, Dr. Compton agreed with the report of the Office of the Inspector General ("OIG") of the U.S. Department of Heath and Human Services, which concluded that a significant barrier to increasing utilization of dental services among the Medicaid-eligible population is that "Medicaid families give dental services a low priority," either because of "competing family priorities or lack of understanding of the importance of good oral health. . . ." (Tr. 5:110; Ex. 1 at 47).

126.   As a result of these and other considerations, Dr. Noel likewise testified that, in his expert opinion, there is a lower demand for dental services among the Medicaid-eligible population than the non-Medicaid eligible population.  (Tr. 6:24-25, 48).

127.   While the shortage of participating dentists in state Medicaid programs also is a factor affecting the utilization of dental services among Medicaid eligible persons, (Ex. 1 at 47), I find that plaintiffs have not sustained their burden of proving, by a preponderance of the evidence, that the poorer oral health outcomes identified by the 2004 Oral Health Report are attributable to any alleged unmet demand for dental services among the Medicaid-eligible population.

128.   To the contrary, the 2004 Oral Health Report itself found that over 70% of the children eligible for MassHealth who participated in the survey listed a dentist and reported that they had received a dental checkup within the past year.  (Ex. 145 at p. 40; Tr. 2:99-100).

129.   In addition, I already have found that each of the plaintiffs who testified at trial was currently receiving and/or had access to Medicaid-covered dental services.

130.   I find, therefore, that the State Officials are meeting the demand for dental services among eligible Medicaid individuals, albeit, in some cases, with delays attributable to each provider's individual scheduling policies.

### F.   MassHealth Provides Members With Regular Notices Concerning The Availability Of EPSDT Dental Services

131.   MassHealth periodically sends eligible members notices concerning the availability of Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") services. (Tr. 1:67; Pls.' Ex. 4; Exs. 22, 132).

132.   Plaintiffs' own testimony establishes that such notices are sent to eligible members approximately every 6 months.  (Tr. 1:63; Pl.'s Ex. 4).

- 25 -

133.    Mrs. Curtis, in fact, received one such notice only a few days before trial.  (Tr. 1:63).

134.    The notice includes a reminder about the importance of dental care.  (Pl.'s Ex. 4; Tr. 1:66; Exs. 22, 132).  It states, in relevant part, as follows:

> To keep your child's teeth healthy, take your child every 6 months starting at age 3 to a dentist who takes MassHealth.  Make sure your child gets:
>
> *    one dental checkup every 12 months;
> *    one teeth cleaning every 6 months; and
> *    any other dental treatments, if your dentist finds problems with your child's teeth.

(Pl.'s Ex. 4; Exs. 22, 132).

135.    All of the listed services are covered by MassHealth.  (Tr. 1:66).

**G.     The Protocol And Periodicity Schedule Utilized By MassHealth For EPSDT Dental Services Is Consistent With Reasonable Standards Of Dental Practice**

136.    Consistent with EPSDT program requirements, MassHealth has adopted standards governing when such services should be provided.

137.    The standards are contained in Appendix W to the MassHealth provider manual.  (Ex. 134; Tr. 6:27-28).

138.    In pertinent part, the standards require that general pediatric preventive care visits to a pediatric primary care provider occur at the following minimum frequency:  one to two weeks, one month, two months, four months, six months, nine months, 12 months, 15 months, 18 months, and then every year until the members 21st birthday.  (Ex. 134; Tr. 6:27).

139.    A dental assessment is required at each EPSDT visit.  (Ex. 134 at pp.1, 3; Tr. 6:28).  More specifically, the standards provide that:

> The screening provider must encourage members to seek regular dental care from a dental provider, beginning at age three years, or earlier, if indicated, including examinations once every six months, preventive services, and treatment, if necessary.

(Ex. 134 at p.3; Tr. 6:28).

140.    In addition, before the age of three, the dental assessment must "include information on fluoride supplementation, proper oral hygiene, and infant caries." (Ex. 134 at p.3; Tr. 6:28).  The primary care provider also must undertake an "observation of the teeth and gums as appropriate." (Ex. 134 at p.1).

141.    After the age of three, the dental assessment "should identify obvious dental problems and ensure that regular visits to a dental provider are occurring." (Ex. 134 at p.3; Tr. 6:28).

142.    MassHealth provides primary care providers with instructional materials to assist them in undertaking these dental assessments.  (Exs. 44, 52).

143.    Dr. Noel reviewed the protocol and periodicity schedule adopted by MassHealth and opined that it is consistent with generally accepted dental standards.  (Tr. 6:28-29).

144.    Plaintiffs presented no evidence to refute Dr. Noel's expert opinion.  Dr. Compton testified merely that the American Dental Association and American Association of Pediatric Dentists recommend that children have an initial dental screening at age 1.  (Tr. 3:118-19).  He did not offer any opinion as to whether it was inconsistent with generally accepted dental standards to provide, as the MassHealth protocol and periodicity schedule provides, for dental assessments to be conducted by the primary care provider at each EPSDT visit, with referrals to a dental provider beginning at age 3, or "earlier if indicated." See id.; Ex. 134 at p. 3.

## II.    PROPOSED CONCLUSIONS OF LAW

### A.    Plaintiffs' Burden Of Proof

1.    Plaintiffs' Third Amended Complaint alleges that the State Officials' "practices and procedures for administering the MassHealth dental program" violate four discrete provisions of the Medicaid Act:  the reasonable promptness provision (Count II); the

comparability provision (Count III); the EPSDT notice provision (Count VI); and the EPSDT reasonableness standard for dental services (Count VII).[10]  (Plfs.' 3rd Am. Compl. at ¶101, ¶103, ¶109, ¶111).

2.      Perfect compliance with the Medicaid Act is not what the law requires, nor what courts have required in addressing in similar challenges to a state's administration of its Medicaid plan.  See Frazar v. Gilbert, 300 F.3d 530, 544 (5th Cir. 2002) ("Congress did not intend that a court can require that a state participating in the Medicaid program must always provide every EPSDT service to every eligible person at all times.  Perfect compliance with such a complex set of requirements is practically impossible, and we will not infer congressional intent that a state achieve the impossible."), rev'd on other grounds sub nom, Frew v. Hawkins, 540 U.S. 431 (2004); Karen L. v. Health Net, 267 F. Supp.2d 184, 192 (D. Conn. 2003) (holding that Medicaid law requires "something less than total and absolute compliance" due to statutory authorization for Secretary to cease payments to a state if "'there is a failure to comply substantially with any such provision [of 42 U.S.C. § 1396a]'"), aff'd, No. 03-7656, 2003 WL 22429040 (2d Cir. Oct. 24, 2003).

3.      I find that the appropriate standard of review for plaintiffs' claims is the same standard that Congress has imposed when the Secretary seeks to compel state Medicaid plan compliance with the Act.  See Karen L., 267 F. Supp.2d at 192.

4.      Pursuant to 42 U.S.C. § 1396c, the Secretary is authorized to withhold federal funds to any state Medicaid plan where "in the administration of the plan there is a failure to

---

[10]The remaining counts of plaintiffs' Third Amended Complaint either have been dismissed voluntarily by plaintiffs (Counts I and IV) or dismissed by the Court in connection with its summary judgment ruling (Count V).  See October 1, 2004 Memorandum of Decision and Order.

comply substantially with any" of the requirements imposed by § 1396a.  42 U.S.C. § 1396c(2) (emphasis added).

5.      Plaintiffs should stand in no better position than the Secretary where, as here, they challenge the State Official's administration of a state Medicaid plan.  Accordingly, to prevail on their remaining statutory claims, I find that plaintiffs must establish by a preponderance of the evidence that the State Officials have failed to "comply substantially" with the relevant provisions of the Act.  See Karen L., 267 F. Supp.2d at 192.

6.      For the reasons detailed below, I conclude that plaintiffs have failed to discharge their burden.

### B.      Plaintiffs Have Failed To Prove That The State Officials Are Violating The Reasonable Promptness Provision Of The Act

7.      The "reasonable promptness" provision of the Act, 42 U.S.C. § 1396a(a)(8), requires that a state plan "provide that all individuals wishing to make application for medical assistance shall have the opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals."

8.      A corresponding provision and regulation provides that the responsible state agency must "[f]urnish Medicaid promptly without delays caused by the agency's administrative procedures" and "continue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible."  42 C.F.R. § 435.930(a)-(b); 42 U.S.C. § 1396a(a)(3).

9.      Another regulation states that the "agency must establish time standards for determining eligibility and inform the applicant of what they are."  42 C.F.R. § 435.911(a). These periods are not to exceed "[n]inety days for applicants who apply for Medicaid on the basis of a disability" or "[f]orty-five days for all other applicants."  42 C.F.R. § 435.911(a)(1)-(2).  Moreover, the agency "must not use time standards" as a "waiting period."  42 C.F.R. § 435.911(e)(1).

10.    The relevant statutory and regulatory language suggests, therefore, that what is required under the reasonable promptness provision is "a prompt determination of eligibility and a prompt provision of funds to eligible individuals to enable them to obtain the medical services that they need." Bruggeman v. Blagojevich, 324 F.3d 906, 911 (7th Cir. 2003). Accord Clark v. Richman, 339 F. Supp.2d 631, 643 (M.D. Pa. 2004). There is no evidence – and plaintiffs do not contend – that the State Officials have failed to comply with these requirements.

11.    Instead, plaintiffs contend that the State Officials are failing to comply substantially with the reasonable promptness provision because eligible members are experiencing delays in obtaining actual access to dental services. See Bryson v. Shumway, 308 F.3d 79, 81 (1st Cir. 2002) (applying the reasonable promptness provision to the delivery of services, not just eligibility determinations); Sobky v. Smoley, 855 F. Supp. 1123, 1147 (E.D. Cal. 1994) (same). Assuming that the reasonable promptness provision is properly applied to the provision of Medicaid covered services, a point the State Officials continue to press, plaintiffs nevertheless fail to establish that the State Officials are violating this provision.

12.    Cases where a violation of the reasonable promptness provision has been found involved the use of state-mandated waiting lists for services that the state was required to provide under the Act. See Bryson, 308 F.3d at 81, 88-90 (remanding for consideration of whether New Hampshire's use of a waiting list to fill available slots for placement in a model home care treatment program violated the reasonable promptness provision); Boulet v. Cellucci, 107 F. Supp.2d 61, 64 (D. Mass. 2000) (reasonable promptness provision violated where state maintained a waiting list for covered services).

13.    No state-mandated waiting list is at issue here. See Proposed Finding No. 72. Furthermore, the evidence establishes that each of the eligible plaintiffs currently has access to dental services. See Proposed Finding Nos. 13-53.

14.     Plaintiffs' reasonable promptness claim, therefore, turns on whether the State Officials are responsible for creating or maintaining the scheduling delays currently existing at participating MassHealth safety net providers.  I conclude that the plaintiffs have failed to establish by a preponderance of the evidence that the State Officials are responsible for these scheduling delays.

15.     As noted above in Proposed Finding Nos. 57-61, safety net providers serve a substantial number of patients who are not MassHealth eligible and they typically do so without regard to the individual's ability to pay.  The demand on the services of safety net providers, therefore, is not attributable solely or even predominately to the State Officials administration of the MassHealth dental program since the evidence establishes that safety net providers have substantial non-MassHealth eligible patient populations.

16.     In addition, as discussed above in Proposed Finding Nos. 71-98, each safety net provider establishes its own scheduling policies, and those policies apply uniformly to MassHealth and non-MassHealth eligible patients.  There is, in short, no evidence that the State Officials are responsible for the individual scheduling policies of each participating provider.  Rather, the evidence establishes, and I so find, that the scheduling policies are driven by the unique needs and patient demands of each provider, matters over which the State Officials have no direct control.

17.     Alternatively, even if one were to assume that the State Officials are responsible for the scheduling delays experienced by MassHealth-eligible patients at safety net providers, plaintiffs nevertheless fail to demonstrate that the State Officials have failed to comply substantially with the reasonable promptness provision.

18.     Reasonableness is, of course, a highly flexible concept that by necessity must include a range of acceptable time periods.  See Doe v. Chiles, 136 F.3d 709, 717 (11th Cir. 1998).

19.     Plainly, there are "certainly some time periods outside that range that no State could ever find to be reasonable."  Id.  It is "axiomatic," for instance, that delays of "several years" are far outside the "realm of reasonableness."  See id. (holding that delays of up to ten years in obtaining Medicaid services violated reasonable promptness provision); see also Sabree v. Richman, 367 F.3d 180, 182 (3rd Cir. 2004) (observing that plaintiffs "languished on waiting lists for years" that the state created to obtain services to which they were entitled).

20.     Reasonableness in other situations, however, is not so easily determined.  See Bryson, 308 F.3d at 89 (remanding for further factual development of reasonable promptness claim where evidence showed that it took approximately a year for the state to make services available to eligible recipients).

21.     Here, the evidence in terms of delay in obtaining covered services varies widely. Although some of the eligible plaintiffs have experienced past incidents of delay in finding a participating dentist and scheduling an appointment, by the time of trial they all had access to dental care and treatment.  See Proposed Finding Nos. 13, 16, 20, 24, 31, 35, 38-40, 44, 50-53. This is consistent with testimony from most of the safety net providers, which establishes that there are no substantial (i.e., unreasonable) delays in scheduling appointments for existing patients.  See Proposed Finding Nos. 76, 78, 85-86, 90, 93.  There also are no delays in obtaining emergency dental services.  See Proposed Finding Nos. 79, 88, 98.

22.     The more difficult situation is presented by the delays experienced by those MassHealth members seeking new appointments at a clinic where they have not previously been

a patient.  The delays in these situations may be as much as several months to a year, depending on the provider.  See Proposed Finding Nos. 91-92, 94-96.

23.     While the delay experienced by this latter category of MassHealth-eligible members appears, at least in some circumstances, to be substantial, I nevertheless conclude that it does not constitute a violation of the reasonable promptness provision.[11]

24.     In this regard, I find it significant that the same scheduling delays are experienced by non-MassHealth eligible patients.  See Proposed Finding Nos. 75, 83, 85, 97.  It strikes me as anomalous to conclude that the reasonable promptness provision could be violated where, as here, non-MassHealth eligible patients (including privately-insured patients) seeking dental services from the same providers as MassHealth eligible patients experience identical delays in scheduling, assuming, again, that the delays are even attributable to the State Officials alleged actions or omissions in administering the MassHealth dental program.

25.     Accordingly, for all of these reasons, I conclude that plaintiffs have failed to sustain their burden of proving that the State Officials have failed to comply substantially with the reasonable promptness provision.

---

[11]Testimony from both plaintiffs' and defendants' experts suggests that 4 to 6 weeks is a reasonable or appropriate time within which to obtain an appointment for routine dental care (i.e., non-emergency care).  (Tr. 5:24; Tr. 6, 25, 29, 48).  There is, however, no evidence establishing that scheduling delays beyond 4 to 6 weeks are unreasonable or inconsistent with established standards of dental care.  See id.  Plaintiffs, for instance, do not contend that any of the safety net providers who testified at trial are rendering substandard care simply because, in some circumstances, new patients must wait more than 4 to 6 weeks for an appointment. Accordingly, while 4 to 6 weeks may appropriately be viewed as the starting point in assessing reasonableness, it is not the ending point.

**C.     Plaintiffs Have Failed To Prove That The State Officials Are
         Violating The Comparability Provision Of The Act**

26.     The "comparability" provision of the Act, 42 U.S.C. § 1396a(a)(10)(B), requires

that a state plan provide that "medical assistance made available to any [categorically needy]

individual . . .

> (i)     shall not be less in amount, duration, or scope that the medical assistance made
>         available to any other such individual, and
> (ii)    shall not be less in amount, duration, or scope than the medical assistance made
>         available to individuals [who are medically needy]. . . .

27.     The First Circuit has explained that the comparability provision is intended to

ensure that the category of Medicaid eligible recipients whom Congress has determined to be the

most in need of assistance and for whom the Act mandates coverage (i.e., the "categorically

needy") will receive such assistance "first and in amounts not less than" that received by other

categories of Medicaid eligibles such as the medically needy, for whom coverage is optional.

See Massachusetts Assn. of Older Am. v. Sharp, 700 F.2d 749, 750, 753 (1st Cir. 1983);

Rodriguez v. City of New York, 197 F.3d 611, (2nd Cir. 1999), cert. denied, 531 U.S. 864 (2000);

see also Proposed Finding No. 5.

28.     This distinction between the two categories of Medicaid eligible beneficiaries is

reflected in the accompanying regulations, which provide, in relevant part, that a state plan "must

provide that the services available to any categorically needy recipient under the plan are not less

in amount, duration, and scope than those services available to a medically needy recipient. . . ."

42 C.F.R. § 440.240(a).

29.     Plaintiffs have presented no evidence – let alone a preponderance of evidence – to

establish that the assistance provided under the MassHealth dental plan varies among different

eligibility categories of Medicaid recipients under age 21.  To the contrary, the governing state

regulations establish that the same dental coverage or assistance is provided under the state plan

- 34 -

to all eligible Medicaid recipients under age 21, without regard to whether the recipient is eligible because he or she "categorically needy" or "medically needy." See 130 C.M.R. § 420.400 et seq.

30.    Plaintiffs nevertheless argue that the State Officials allegedly are violating the comparability provision because eligible recipients experience different delays in obtaining services from participating providers and access to dental services is not uniformly distributed throughout all parts of the state. See Plfs.' Opp. to Defs.' Rule 52(c) Mot. at 2-3.

31.    The comparability provision, however, does not require "uniform proximity" to dental facilities or "identical convenience of service everywhere in the state." Bruggeman, 324 F.3d at 911. It is instead intended to prevent "discrimination" among the different categories of Medicaid eligibility. See Sharp, 700 F.2d at 750, 753. So long as there is no discrimination in coverage among similarly situated eligible members who are categorically needy and medically needy, there is no basis upon which a violation of § 1396a(a)(10)(B) could be found.[12] See Sharp, 700 F.2d at 750, 753; see also Rodriguez, 197 F.3d at 616 (Section 1396a(a)(10)(B)'s "only proper application is in situations where the same benefit is funded for some recipients but not others"). No such discrimination based on eligibility categories has been proved here.

32.    Plaintiffs also argue that the State Officials are violating the comparability provision because eligible recipients utilize less dental services than the non-Medicaid

_____

[12]The comparability provision also prohibits discrimination within the categorically needy group. See Antrican v. Buell, 158 F. Supp.2d 663, 672 (E.D.N.C. 2001), aff'd, 290 F.3d 178 (4th Cir. 2002); Rodriguez, 197 F.3d at 614. Plaintiffs have not proved, however, that MassHealth discriminates within the categorically needy eligible group. With regard to scheduling, for instance, the evidence establishes that any delays are experienced by all new patients seeking routine dental appointments, not just among MassHealth patients who are categorically needy. See Proposed Finding Nos. 75, 83, 85, 97. Moreover, as noted above, MassHealth provides the same coverage to all eligible members, not just some categorically eligible members.

population.  See Plfs.' Opp. to Defs.' Rule 52(c) Mot. at 3.  The plain language of
§ 1396a(a)(10)(B) establishes that it is not intended to require State Officials to ensure
comparable utilization of dental services with the non-Medicaid eligible population.  As already
discussed, the statute instead requires comparability among similarly situated members of
Medicaid eligible groups, not non-Medicaid eligible groups.

33.     Nor, in all events, have plaintiffs sustained their burden of establishing that the
State Officials are responsible for the lower utilization of dental services among the Medicaid-
eligible population than the non-Medicaid population.  See Proposed Findings Nos. 113-130.

**D.     Plaintiffs Have Failed To Prove That The State
        Officials Are Violating The EPSDT Notice Provision**

34.     The EPSDT "notice" provision, 42 U.S.C. § 1396a(a)(43), requires, in relevant
part, a state plan to provide for (a) "informing all persons in the State who are under the age of
21 and who have been determined to be eligible for medical assistance including services
described in section 1396d(a)(4)(B) of this title, of the availability of early and periodic
screening, diagnostic, and treatment services as described in section 1396d(r) . . ." and (b)
"providing or arranging for the provision of such screening services in all cases where they are
requested. . . "

35.     I already have found, based on plaintiffs' own testimony, that MassHealth
provides eligible members with notices informing eligible children or their families of the
availability of EPSDT dental services.  See Proposed Finding Nos. 131-135.  Accordingly, I
conclude that plaintiffs have failed to sustain their burden of proving that the State Officials are
not in substantial compliance with this aspect of the EPSDT notice provision.

36.     I further conclude that plaintiffs have not presented evidence sufficient to
establish that the State Officials have failed to "provide or arrange" for EPSDT dental screening
services as required by the second clause of § 1396a(a)(43).

37.     As detailed above, <u>see</u> Proposed Finding Nos. 99-130, plaintiffs seek to equate what they describe as the low utilization of EPSDT services by eligible members with the State Officials' alleged failure to provide or make such services available.  The State Officials' responsibility to provide or arrange for EPSDT screening services, however, is triggered only when the services are requested by the member.  <u>See</u> 42 U.S.C. § 1396a(a)(43)(B).

38.     Plaintiffs have failed to meet their burden of demonstrating that the State Officials have denied or otherwise failed to provide any eligible MassHealth member with EPSDT screening services when such services have been requested.

39.     Instead, plaintiffs assume that the <u>need</u> for EPSDT services demonstrated, among other things, by the data contained in the 2004 Oral Health Report, establishes that there is a <u>demand</u> for services.[13]  Need is not the same as demand.

40.     I already have found that there are multiple socioeconomic and cultural factors affecting the relatively low demand for dental services among the Medicaid-eligible population that are not shared by the privately insured and uninsured populations.  <u>See</u> Proposed Finding Nos. 113-126.

41.     Although the availability of a participating dentist is an important factor affecting the demand for dental services among the Medicaid-eligible population, the 2004 Oral Health

---

[13]Plaintiffs also argue that since current EPSDT utilization figures are below the participation goals established for the program, the State Officials are not in substantial compliance with the EPSDT notice provision.  <u>See</u> Plfs.' Opp. to Defs.' Rule 52(c) Mot. at 4 (citing State Medicaid Manual § 5360).  There is no private right of action, however, to enforce a state's failure to achieve EPSDT performance goals.  <u>See</u> <u>Frazar</u>, 300 F.3d at 545 (holding that private plaintiffs cannot maintain an action "to require a [State] plan to meet [EPSDT] statewide or systemwide participation or performance measures, because . . . state compliance with such standards is not an individualized right actionable under § 1983").  Nor, in all events, does a state's failure to achieve such aspirational goals establish substantial noncompliance with § 1396a(a)(43).

Report itself establishes that over 70% of the MassHealth children who participated in the survey listed a dentist and had a dental checkup within the last year.  (Ex. 145).

42.     The evidence, therefore, does not support plaintiffs' bald assumption that the State Officials are failing to fulfill any unmet demand for EPSDT screening services among the eligible MassHealth.

       **E.**      **Plaintiffs Have Failed To Prove That The State**
                  **Officials Are Violating The EPSDT Reasonableness Standard**

43.     Other EPSDT provisions, 42 U.S.C. § 1396a(a)(10)(A), § 1396d(a)(4)(B), § 1396d(r), require, in relevant part, that EPSDT dental services be provided:

> (i) at intervals which meet reasonable standards of dental practice, as determined by the state after consultation with recognized dental organizations involved in child health care, and
> (ii) at other such intervals, indicated as medically necessary, to determine the existence of a suspected illness or condition. . . .

44.     For the reasons detailed in Proposed Finding Nos. 136-144, I conclude that plaintiffs have failed to discharge their burden of proving that the periodicity schedule for EPSDT dental services fails to comply substantially with "reasonable standards of dental practice" as required by 42 U.S.C. § 1396d(r).

## III.   PROPOSED JUDGMENT

1.     By reason of the foregoing conclusions of law and findings of fact, and, alternatively, for the reasons set forth previously in the State Officials' motion for summary, opposition to plaintiffs' motion to amend, and motions in limine, all of which are expressly incorporated herein and relied upon by reference, plaintiffs have failed to prove by a preponderance of the evidence that the State Official's administration of the MassHealth dental program fails to comply substantially with the subject provisions of the Medicaid Act.

2.    Accordingly, judgment should enter in favor of the defendant State Officials on each and every claim asserted in this action pursuant to Fed. R. Civ. P. 52 and 58.

Respectfully submitted,

THOMAS F. REILLY,
ATTORNEY GENERAL

*[s] James J. Arguin*
James J. Arguin (BBO #557350)
Maite A. Parsi (BBO #554009)
Assistant Attorneys General
Government Bureau
One Ashburton Place
Boston, MA 02108
(617) 727-2200

Dated:  January 10, 2005

## CERTIFICATE OF SERVICE

I, James J. Arguin, hereby certify that I have this date served a copy of the foregoing *Defendant State Officials' Proposed Findings of Fact and Conclusions of Law Pursuant to Fed. R. Civ. P. 52(a)* by mailing, postage prepaid, a copy of the same to the following counsel of record:

Clare D. McGorrian, Esq.
Health Law Advocates
30 Winter Street, Suite 940
Boston, MA 02108

I further certify that, in addition to mailing, I e-mailed an electronic version of the foregoing document to Attorney McGorrian's e-mail address:  mcgorrian@hla-inc.org.

Signed under the pains and penalties of perjury this 10th day of January, 2005.

*[s] James J. Arguin*
James J. Arguin